UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BENTLEY MOTORS LIMITED
CORPORATION and BENTLEY
MOTOR, INC.,

     Plaintiffs,

v.                   Case No. 8:12-cv-1582-T-33TBM

MATTHEW McENTEGART, FUGAZZI
CARS, INC., ROBERT FRARY III,
and KEEPING IT REAL AUTO
CUSTOMIZING, INC.,

     Defendants.
_____/

## ORDER

This matter comes before the Court in consideration of Plaintiff Bentley's Motion for Entry of Summary Judgment Against the Frary Defendants and Renewal of Motion for Default Judgment Against the Fugazzi Defendants. (Doc. # 94), filed on June 27, 2013. Defendants Robert Frary III and Keeping It Real Auto Customizing, Inc. filed an affidavit (Doc. # 106) as well as a memorandum (Doc. # 109) in opposition to Bentley's Motion on August 29, 2013, and September 6, 2013, respectively. As further detailed herein, the Court grants Bentley's Motion for Summary Judgment as to the Frary Defendants and grants Bentley's Motion for Default Judgment as to the Fugazzi Defendants.

## I.   __Background__

Bentley Motors Limited Corporation is a foreign corporation organized under the laws of the United Kingdom. (Doc. # 1 at ¶ 14).[1] Bentley Motors, Inc., is a Delaware corporation that maintains its principal place of business in Boston, Massachusetts. (__Id.__ at ¶ 15). These entities, collectively referred to herein as "Bentley," employ certain trademarks "in connection with the sale, distribution, maintenance, service, and repair of . . . Bentley automobiles and related products and services." (__Id.__ at ¶ 26).

Defendant Fugazzi Cars, Inc. is a Florida corporation operating in St. Petersburg, Florida. (Doc. # 43 at 2). Defendant Matthew McEntegart is the owner and operator of Fugazzi. (__Id.__). The Court refers to Fugazzi and McEntegart

---

[1] Bentley's Complaint in this matter is accompanied by the verification of Debra Kingsbury, Assistant General Counsel, Sales and Marketing, for Volkswagen Group of America, Inc., which encompasses Bentley Motors, Inc. Kingsbury avers that she "is responsible for the trademark program of the Bentley brand in the United States," and that she has personal knowledge of the factual statements within the Complaint. Accordingly, the Court considers the verified Complaint to be the evidentiary equivalent of an affidavit for the purpose of evaluating Bentley's Summary Judgment Motion. __See__ Fed. R. Civ. P. 56(c)(4); __Gordon v. Watson__, 622 F.2d 120, 123 (5th Cir. 1980) ("[A] verified pleading may itself be treated as an affidavit in support of a motion for summary judgment, but only if it satisfies the standards for affidavits set out in Rule 56[(c)(4)].").

collectively as "the Fugazzi Defendants" herein.  Defendant Keeping It Real Auto Customizing, Inc. is a Florida corporation operating in Clearwater, Florida.  (Id.). Defendant Robert Frary is the "president and CEO" of Keeping It Real.  (Frary Dep. Doc. # 94-4 at 1).  The Court refers to Frary and Keeping It Real collectively as "the Frary Defendants" herein.

According to Bentley, "Defendants unlawfully manufacture[d] Bentley body kits that transform ordinary and inexpensive Chrysler and Ford vehicles into knockoff Bentley vehicles," and "intentionally misappropriated the overall appearance and shape of the Bentley GTC automobile, as well as [various Bentley] trademarks, . . . by incorporating them into 'Bentley Car Kits' . . . ."  (Doc. # 1 at ¶¶ 1-7).

On July 16, 2012, Bentley initiated this action against Defendants for (1) trademark dilution pursuant to 15 U.S.C. § 1125(c); (2) trademark infringement and counterfeiting pursuant to 15 U.S.C. § 1114(1); (3) false advertising, false designation of origin, and trade dress infringement pursuant to 15 U.S.C. § 1125(a); and (4) design patent infringement pursuant to 35 U.S.C. § 271. (Id. at ¶¶ 39-64).

On July 18, 2012, Bentley filed a motion for preliminary injunction, seeking to enjoin Defendants from, among other activities, "manufacturing, advertising, and/or selling knockoff 'Bentley vehicles' or 'Bentley body kits.'" (Doc. # 5 at 1). On September 19, 2012, the Honorable Thomas B. McCoun III, United States Magistrate Judge, issued a Report and Recommendation which recommended that the motion for preliminary injunction be granted. (Doc. # 43). Finding Judge McCoun's Report and Recommendation to be thorough and well-reasoned, the Court adopted the Report and Recommendation and granted the motion for preliminary injunction on October 9, 2012. (Doc. # 47).

On October 26, 2012, Bentley moved for a Clerk's entry of default against the Fugazzi Defendants, and on November 26, 2012, the Clerk entered default against these Defendants pursuant to Federal Rule of Civil Procedure 55(a). (Doc. ## 55, 60). On December 18, 2012, Bentley filed a motion for default judgment against the Fugazzi Defendants. (Doc. # 71). On December 19, 2012, the Court held a hearing at which McEntegart stated his acquiescence to the entry of default judgment against him. (Doc. # 73).

Rather than granting Bentley's motion for default judgment at that time, the Court denied the motion without prejudice for consideration at a later stage of the litigation, noting that this action would remain pending between Bentley and the Frary Defendants. (Doc. # 75). Instead, the Court granted Bentley's request for a permanent injunction against the Fugazzi Defendants. (Id. at 4).

On June 27, 2013, Bentley filed the instant Motion for Entry of Summary Judgment against the Frary Defendants and Renewal of Motion for Default Judgment Against the Fugazzi Defendants. (Doc. # 94). Within the Motion, Bentley seeks: (1) entry of a permanent injunction against the Frary Defendants, (2) an award of statutory damages "in an amount of at least $1,000,000.00 pursuant to 15 U.S.C. § 1117(c)," and (3) an award of Bentley's attorney fees and costs pursuant to 15 U.S.C. § 1117(a). (Id. at 6-7).

The Frary Defendants, who are represented by counsel, failed to file a response to Bentley's Motion within the time provided by the Court's Case Management and Scheduling Order. Noting this failure to respond, the Court entered a separate Order on August 15, 2013, directing the Frary Defendants to file a response to Bentley's Summary Judgment

Motion on or before August 22, 2013.  (Doc. # 105).  Again, the Frary Defendants failed to respond on or before the deadline imposed by the Court.   However, on August 29, 2013, the Frary Defendants filed an unauthorized "response" to the Motion for Summary Judgment, consisting of only Frary's own, brief affidavit (the 2013 Affidavit).  (2013 Aff. Doc. # 106).

Contemporaneously with the 2013 Affidavit, the Frary Defendants filed a "Motion for Extension of Time as to Plaintiffs' Motion for Summary Judgment" (Doc. # 107), explaining that "Defendant Robert Frar[y] III, owner of Keeping it Real Auto, Inc.[,] filed an original affidavit on September 10, 2012" (the 2012 Affidavit), and that "Defense believed his affidavit was testimony in opposition to Plaintiff's Motion for Summary Judgment," despite having been filed more than eight months prior to the relevant Motion.  (Id. at 1).  On August 30, 2013, the motion for extension of time was denied without prejudice for failure to comply with the Local Rules of this Court.  (Doc. # 108).

On September 6, 2013, the Frary Defendants filed a memorandum in opposition to Bentley's Motion for Summary Judgment (Doc. # 109), and on the same date filed a second

motion for extension of time (Doc. # 110).  Within this extension motion, the Frary Defendants certified that they had contacted Bentley and that Bentley did not object to the Frary Defendants' requested extension of time to file a memorandum in opposition, provided Bentley would be permitted to file, within 5 days, "a short response and affidavits." (Id. at 2).  On September 9, 2013, the Court entered an Order granting the motion for extension of time, granting Bentley leave to file a reply, and specifying that the Court would consider the 2013 Affidavit of Robert Frary and the corresponding memorandum in opposition as if timely filed.  (Doc. # 111).  Bentley filed a reply on September 13, 2013.  (Doc. # 112).

The Court has carefully reviewed the Motion, the response, and the reply, and is otherwise fully advised in the premises.

## II.  **The Frary Defendants' Response**

### A.   **Affidavits and Testimony**

As a preliminary matter, the Court will consider the practical impact of Frary's 2013 and 2012 Affidavits on the Court's summary judgment analysis.  Notably, Bentley has provided relevant excerpts of Frary's deposition testimony in support of its Motion.  (Doc. # 94-4).  The Court is

thus tasked with reconciling the factual content of Frary's Affidavits with that of his deposition testimony.

Within Frary's deposition, when asked about the extent of his work with the Bentley kit cars, Frary testified as follows:

> Q:   All right. So this was for a Bentley kit that you were working on for Mr. Johnson?
>
> A:   Yes.
>
> Q:   And then it says, mold and fill door jambs, mold and fill trunk jambs, bodywork and paint car, close door gaps, trunk, extra time, and then paint and strut and core support. So that's work that you-all performed?
>
> A:   Yes.
>
> Q:   And it looks like you charged him $5,885?
>
> A:   Yes.

(Id. at 9). Later, in response to a question about a check written to Frary for $2,000.00, Frary testified as follows:

> Q:   Why are they writing you a check for -- what's your understanding of why they're writing you a check for $2,000?
>
> A:   It was for money owed for work that I was doing for Fugazzi Cars.
>
> Q:   And what work did you do for Fugazzi Cars that was the subject of this check?
>
> A:   Paint and body.
>
> Q:   And was this also for a Bentley kit?

A:   Yes.

(Id. at 10-11).   Furthermore,  in  reference  to  certain
pictures  taken  of  Bentley  kit  cars  in  various  stages  of
completion, Frary testified as follows:

> Q:   Okay.  And then could you tell me what the
> next page is on Exhibit 9?  There's nine, it
> looks like, photocopies of photos.
>
> A:   Pictures of bodywork being performed.
>
> Q:   And where was that bodywork being performed?
>
> A:   At Keeping It Real.
>
> Q:   And those were Bentley kits as well?
>
> A:   Yes.  That was the kit we were working on.

(Id. at 12).  Frary additionally testified that he ordered
online a "Bentley-style sticker for a Chrysler 300 [wheel]"
and placed the sticker on the wheel of a Bentley kit car
himself (Id. at 20-21), and also provided a detailed
description  of  the  events  taking  place  in  a  series  of
pictures supplied by Bentley's counsel:

> Q:   So that's Nick on the left and you on the
> right?
>
> A:   Yes.
>
> Q:   Okay.  And what are you doing in this one?
>
> A:   Sanding the car.
>
> Q:   And that's a Bentley kit?

A:   Yes.

Q:   Okay.   This is one of the wheels, and was
     that at your shop or at --

A:   Keeping It Real.

Q:   Keeping It Real.   And this is one of the
     wheels that you put the Bentley logo on?

A:   Yes.

Q:   Okay. Let's See.  Whose shop is this?

A:   Keeping It Real.

Q:   And how many Bentley kits were in the shop
     at this time, if you can tell from looking
     at the video?  More than one?

A:   Three.

(Id. at 33).

Also highly relevant is Frary's deposition testimony
regarding Keeping It Real's Facebook page.  In response to
the question, "who writes the posts at Keeping It Real
Custom's Facebook page? Is that you?"; Frary replied,
"Yes."  (Id. at 16).  Frary proceeded to testify about
several particular Facebook communications, providing the
following testimony:

Q:   . . . Calvin Brown writes, "Is Keeping It
     Real Customizing and Fugazzicars the same
     company?  I'm confused."  And then you
     wrote, "we are friend for 15 years he does
     interior i do paint and body we do a lot of

> the bentley builds together."   And that's
> what you posted, correct?
>
> A:   Yes.
>
> Q:   And then he writes back, "Nice.  It's good
>      stuff.  Looks great.  So who do I contact if
>      I want either a Bentley convertible or the
>      hard top . . . with interior and exterior."
>      And you wrote back, "either one we work
>      together on it." Do you see that?
>
> A:   Yes.
>
> Q:   And you posted that, correct?
>
> A:   Yes.

(Id. at 23).   Frary additionally admitted to posting the
enthusiastic comment: "gonna flood the streets with these
bad boys for the 2012 (sic)."  (Id. at 28).

    In stark contrast with this deposition testimony, on
August 29, 2013, Frary filed with the Court the 2013
Affidavit, labeled "Affidavit of Robert Frary in Opposition
to Plaintiffs' Motion for Summary Judgment," which provides
as follows:

> 1.   I am over the age of twenty-one, competent,
>      and otherwise have personal knowledge of
>      the facts set forth [in] the Affidavit.
>
> 2.   All my actions with Fugazzi Car's [sic] were
>      done under Keeping it Real Auto, Inc.
>
> 3.   Keeping it Real Auto, Inc[.] is a Florida
>      Corporation that has been in operation since
>      1999.

4.  I am the President of Keeping it Real Auto, Inc.

5.  I dispute the facts and allegations presented in Plaintiffs['] Motion for summary judgment.

6.  I never designed any kit cars and or used a similar Bentley sign on any vehicle.

7.  I never aided in the design or making of any Fugazzi Kit cars but only painted vehicles for Fugazzi Cars, Inc.

8.  Bentley never sent myself or my company Keeping it Real Auto, Inc[.] a cease and desist but I agreed to stop painting cars for Fugazzi Cars, Inc.

9.  No one has threatened, coerced, or offered me anything in exchange for this testimony. I have made this affidavit freely and voluntarily.

(Doc. # 106 at 1-2).

Paragraphs one through four of the 2013 Affidavit are identical to paragraphs one through four of the 2012 Affidavit, to which the Frary Defendants refer in their memorandum in opposition to Bentley's Summary Judgment Motion.  The 2012 Affidavit proceeds:

5.  I have never received a cease and desist or any other communications from Plaintiff until the filing of the lawsuit.

6.  Keeping it Real Auto, Inc. never received a cease and desist or any other communications from Plaintiff until the filing of the lawsuit.

12

7.  Keeping it Real Auto only painted three vehicles for Fugazzi Cars, Inc.

8.  I was unaware that Fugazzi Cars, Inc. was doing anything legally wrong by them building vehicles.

9.  Keeping it Real Auto, Inc. was promised further paint work if any job sold and therefore were the only reason for being on Facebook and any other site on the internet.

10.  Keeping it Real Auto, Inc. stated that I build Matt's kits on a blog [ ].

11.  The term "build" matt's kits[ ] was nothing more than painting the cars.

12.  Keeping it Real Auto, Inc. took one deposit down for $10,000 on July 20, 2012 from Valentina Plundurs prior to a lawsuit being served and then returned the monies on August 27, 2012 subsequent to the lawsuit being served.

13.  The Plundurs deposit was for a Fugazzi Kit car.

14.  No one has threatened, coerced, or offered me anything in exchange for this testimony. I have made this affidavit freely and voluntarily.

(2012 Aff. Doc. # 37 at 2-3).

**B.   <u>Sham Affidavit Doctrine</u>**

"When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without

explanation, previously given clear testimony." Van T. Junkins and Assocs., Inc. v. U.S. Indus., Inc., 736 F.2d 656, 657 (11th Cir. 1984).  The Eleventh Circuit deems such affidavits to be "shams," and, although a court should not reject an affidavit merely because it is at odds with statements made in an earlier deposition, the court need not give credence to an affidavit that contradicts previous testimony without any valid explanation or clarification. See Moulton v. DeSue, No. 3:11-cv-382-J-37JBT, 2012 WL 5378807, at *1 (M.D. Fla. Oct. 31, 2012) ("The Court may find an affidavit which contradicts testimony on deposition a sham when the party merely contradicts its prior testimony without giving any valid explanation.") (internal quotation omitted).

The Court acknowledges that "the 'sham affidavit' doctrine[ ] should be applied 'sparingly.'" Mortg. Payment Protection, Inc. v. Cynosure Fin., Inc., No. 6:08-cv-1212, 2011 WL 2670081, at *4 (M.D. Fla. July 8, 2011) (quoting Rollins v. TechSouth, Inc., 833 F.2d 1525, 1530 (11th Cir. 1987)).  "Before striking an affidavit, the court must find 'some inherent inconsistency' between an affidavit and the affiant's sworn testimony." Id. (quoting Tippens v. Celotex Corp., 805 F.2d 949, 954 (11th Cir. 1986)).  "'If no

14

inherent inconsistency exists, the general rule allowing an affidavit to create a genuine issue[,] even if it conflicts with earlier testimony in the party's deposition, governs.'" Id. (quoting Rollins, 833 F.2d at 1530). "Therefore, the Court must distinguish between 'discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence.'" Id. (quoting Tippens, 805 F.2d at 953).

### 1.   2013 Affidavit

After carefully reviewing both the 2013 Affidavit and Frary's deposition testimony, the Court is convinced that this Affidavit constitutes precisely the type of "transparent sham" contemplated by the Eleventh Circuit. More than one inherent inconsistency exists between the Affidavit and Frary's sworn testimony. For instance, in the Affidavit Frary states: "I never designed any kit cars *and or used a similar Bentley sign on any vehicle*." (Doc. # 106 at 2) (emphasis added). In his deposition, however, Frary confirmed that a picture of a car wheel depicted a "wheel[ ] that [he] put the Bentley logo on." (Doc. # 94-4 at 33). Additionally, Frary testified in response to the question: "And then who put the [Bentley B and wings]

15

sticker on the wheel?" by clearly stating, "I did."   (<u>Id.</u> at 21).

Another inherent inconsistency exists between Frary's sworn affidavit statement, "I never aided in the design *or making* of any Fugazzi Kit cars *but only painted vehicles for Fugazzi Cars, Inc.*," (Doc. # 106 at 2) (emphasis added), and his deposition testimony, in which Frary confirmed that he had "mold[ed] and fill[ed] door jambs, mold[ed] and fill[ed] trunk jambs, [performed] bodywork and paint[ed] [the] car, close[d] door gaps, trunk, . . . and then [completed] paint and strut and core support" on a Bentley kit car.   (Doc. # 94-4 at 9).   Frary's admission to this particularized description of his contribution to the manufacturing of a Bentley kit car directly conflicts with his Affidavit statement that he never "aided in the design or making" of a Bentley kit car, but instead "only painted vehicles for Fugazzi Cars, Inc."   (Doc. # 106 at 2).

Frary's deposition testimony consistently reflects more involvement with the production of the Bentley kit cars than merely painting the vehicles.   In response to the question: "And what work did you do for Fugazzi Cars that was the subject of this check [for $2,000.00]?"   Frary responded, "Paint and body."   (Doc. # 94-4 at 11).

16

Additionally, Frary confirms in his deposition that a photograph shows him "sanding" a Bentley kit.  (Id. at 33).

Accordingly, although Frary has testified that Fugazzi Cars "created" the Bentley kit, and that, in some instances, cars would arrive at his shop with the Bentley kit already "installed," (Id. at 10), Frary has provided ample testimony demonstrating that he played a substantial role in manufacturing the infringing finished product -- Bentley kit cars.  To the extent Frary may have desired to clarify some of the inherent inconsistencies introduced by the 2013 Affidavit, Frary had more than sufficient time to do so.  This Court not only provided Frary thirty days to respond to Bentley's Motion for Summary Judgment (Doc. # 74 at 1), but also extended that deadline, sua sponte, upon finding that the Frary Defendants had failed to respond to the Motion (Doc. # 105).  Frary declined to file a response in compliance with either deadline.  Even the response ultimately filed by the Frary Defendants on September 6, 2013, fails to explain any inconsistencies between Frary's deposition testimony and the 2013 Affidavit, but instead contains primarily conclusory statements regarding Frary's liability in this matter.  See (Doc. # 109 at 2) ("Defendants did not install or design any kit cars so any

17

intentional misappropriation to Defendants is false."). The Court thus disregards Frary's conclusory and uncorroborated 2013 Affidavit for purposes of evaluating Bentley's Motion for Summary Judgment.

### 2. **2012 Affidavit**

Furthermore, to the extent the Frary Defendants intended the 2012 Affidavit to create a genuine issue of material fact in this matter, the Court finds that it fails to do so. Frary's statement that "Keeping it Real Auto only painted three vehicles for Fugazzi Cars, Inc.," (1) is inconsistent with Frary's deposition testimony, if Frary intended to imply that this was the extent of his involvement in manufacturing, advertising, and selling the kit cars, and (2) does not create a genuine issue of fact as to Bentley's claims against the Frary Defendants, even if the Court were to consider the Affidavit despite its inconsistency with Frary's deposition testimony. The number of cars Frary painted is inconsequential in determining whether Frary is liable for Bentley's claims in light of the entire record before the Court.

Likewise, to the extent the Frary Defendants intended Frary's 2012 Affidavit statement regarding the $10,000 deposit from "Valentina Plundurs" to mean the Frary

Defendants engaged in no other commercial activity related to the production and sale of Bentley kit cars, the Court finds this statement inconsistent with Frary's deposition testimony.   As explained above, Frary has had ample opportunity to explain these inconsistencies and has declined to do so.   The Court thus disregards both Affidavits for purposes of its summary judgment analysis.

**III. Summary Judgment Against Defendants Robert Frary and Keeping It Real Auto Customizing, Inc.**

   **A.   Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.   Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)).   A fact is

material if it may affect the outcome of the suit under the governing law.  Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).  The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial."  Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (citing Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor.  Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1164 (11th Cir. 2003).  If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the

court should not grant summary judgment.  Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988) (citing Augusta Iron & Steel Works, Inc. v. Emp'rs Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988)).

However, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required.  Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981), cert. denied, 456 U.S. 1010 (1982).

**B.   Discussion**

Bentley seeks summary judgment on its claims for (1) trademark infringement under 15 U.S.C. § 1114(1); (2) trademark counterfeiting under 15 U.S.C. § 1114(1); (3) trademark dilution under 15 U.S.C. § 1125(c); and (4) false designation of origin under 15 U.S.C. § 1125(a).  (Doc. # 94 at 6, 19).

The Court notes that, in the Complaint, Bentley additionally stated a claim for false advertising, trade dress infringement, and design patent infringement.  (Doc. # 1 at 19-20).  However, Bentley has not listed these causes of action as a basis for summary judgment against the Frary Defendants.  See (Doc. # 94 at 2) ("Bentley is entitled to summary judgment on its trademark

21

counterfeiting, infringement, dilution, false designation of origin, and common law[2] trademark infringement claims."); (Id. at 6) ("Bentley seeks summary judgment on Bentley's claims for federal trademark infringement and counterfeiting, trademark dilution, and false designation of origin . . . ."); (Id. at 19) (same). Accordingly, the Court confines its summary judgment analysis to Bentley's claims of trademark infringement, trademark counterfeiting, trademark dilution, and false designation of origin.

### 1.   **Trademark Infringement**

Trademark infringement is proscribed by 15 U.S.C. § 1114(1)(a). That provision reads, in relevant part:

> (1) Any person who shall, without the consent of the registrant -
> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale,

---

[2] Although Bentley purportedly seeks summary judgment on its "common law trademark infringement" claim, Bentley did not raise such a claim within the Complaint. Thus, although Bentley argues in the Motion for Summary Judgment that "[t]he central element of Bentley's claims for federal trademark infringement . . . and common law infringement is the same," (Doc. # 94 at 19), the Court declines to address on summary judgment a new claim which Bentley did not include, nor seek leave to include, in its Complaint. See Newman v. Ormond, 396 F. App'x 636, 639 (11th Cir. 2010) (holding that the district court was not required to address new claims raised in summary judgment motion, despite liberal pleading standard for civil complaints, since standard did not afford plaintiffs opportunity to raise new claims at summary judgment stage).

> offering for sale, distribution, or advertising
> of any goods or services on or in connection with
> which such use is likely to cause confusion, or
> to cause mistake, or to deceive . . . shall be
> liable in a civil action by the registrant for
> the remedies hereinafter provided.

Thus, to succeed on a trademark infringement claim, a plaintiff must prove (1) that its valid mark was used in commerce by the defendant without consent, and (2) that the unauthorized use was likely to cause confusion, to cause mistake, or to deceive. See General Motors Corp. v. Phat Cat Carts, Inc., 504 F. Supp. 2d 1278, 1283 (M.D. Fla. 2006); Dieter v. B&H Indus. of S.W. Fla., Inc., 880 F.2d 322, 326 (11th Cir. 1989).

### a. **Trademark Validity and Unauthorized Use**

The parties do not dispute that Bentley is the registered owner of the trademarks BENTLEY® and the B IN WINGS®. Furthermore, Bentley has produced certificates of registration issued by the United States Patent and Trademark Office for these marks, (Doc. # 1-6), which serve as prima facie evidence of the validity of the registered marks and of Bentley's ownership and exclusive right to use the marks in commerce. 15 U.S.C. § 1057(b). Bentley additionally owns the Bentley B™, despite its status as an unregistered trademark. See Bauer Lamp Co., Inc. v.

Shaffer, 941 F.2d 1165, 1171 (11th Cir. 1991) ("Under the Lanham Act such registration is not necessary . . . trademark protection accrues with use."); Turner Greenberg Assoc., Inc. v. C&C Imports, Inc., 320 F. Supp. 2d 1317, 1330 (S.D. Fla. 2004) ("Ownership of a trademark can be shown by establishing actual prior use.").  Furthermore, no Defendant in this matter has claimed that Bentley consented to Defendants' use of Bentley's marks or of any colorable imitation of Bentley's marks.

### b.  Likelihood of Confusion

"Proof of 'likelihood of confusion' is the *sine qua non* in actions for 15 U.S.C. § 1114 trademark infringement . . . ."  Fila U.S.A., Inc. v. Kim, 884 F. Supp. 491, 494 (S.D. Fla. 1995).  "Determination of likelihood of confusion requires analysis of the following seven factors: (1) type of mark, (2) similarity of mark, (3) similarity of the products the marks represent, (4) similarity of the parties' retail outlets and customers, (5) similarity of advertising media used, (6) defendant's intent and (7) actual confusion."  Dieter, 880 F.2d at 326.  "The most persuasive evidence in assessing the likelihood of confusion is proof of actual confusion."  Alliance Metals,

Inc. of Atlanta v. Hinely Indus., Inc., 222 F.3d 895, 907
(11th Cir. 2000).

"Although  likelihood  of  confusion  generally  is  a
question  of  fact,  it  may  be  decided  as  a  matter  of  law."
Alliance Metals, 222 F.3d at 907.   In this case, Bentley
has demonstrated convincingly that Defendants' kit cars are
likely  to  cause  consumer  confusion.    These  finished  kit
cars  "are  from  appearance  substantially  identical  to  the
genuine  [Bentley]  products."  Rolls-Royce Motors Ltd. v. A &
A Fiberglass, Inc., 428 F. Supp. 689, 695 (N.D. Ga. 1977).
The  likelihood  of  confusion  is  thus  "readily  apparent."
Id.; see also Babbit Elec., Inc. v. Dynascan Corp., 38 F.3d
1161,  1179  (11th  Cir.  1994)  ("[A]  likelihood  of  confusion
can  be  found  as  a  matter  of  law  if  the  defendant  intended
to  derive  benefit  from  the  plaintiff's  trademark.").

As  explained  by  the  court  in  Rolls-Royce Motors Ltd.
v. A & A Fiberglass, Inc.,

> At the outset, mere visual comparison between the
> Rolls-Royce  and  [the  infringer's]  products
> reveals their striking similarity.  Second . . .
> the court need not invariably find confusion or
> deception on the part of potential purchasers but
> may look as well to public identification of the
> symbols.   It is evident, from the defendant's
> advertising alone, that its kits were selling and
> were  designed  to  sell  primarily,  if  not
> exclusively,  because  of  public  recognition  of
> Rolls-Royce.   Further, there is no need to show

> actual deception or confusion but merely the
> likelihood thereof and, thus, testimony of
> witnesses to the effect that they were in fact
> misled is not an invariable requirement.

428 F. Supp. at 695. Additionally, "confusion need not always be that of a potential purchaser but can exist where the defendant duplicated the protected trademarks and sold them to the public knowing that the public would identify them as being the [plaintiffs'] trademarks." Id. at 694 (internal quotation omitted).

Bentley has provided ample evidence demonstrating a likelihood of confusion. Beyond the evidence of Defendants' concurrent use of Bentley's protected marks, Bentley has demonstrated actual confusion by proffering several consumer expressions reflecting the similarities between Defendants' vehicles and the real Bentley Continental GTC. One such expression was posted on Keeping It Real's Facebook page on February 17, 2012, by "Ted Parkes." (Doc. # 94-2 at 9). Parkes posted a photograph of a presumably authentic Bentley Continental GTC, stating "[a]lmost thought this one was you guys when it passed me . . . ." (Id.).

Additionally, Bentley presents online articles discussing the resemblance between Defendants' vehicles and

the genuine Bentley Continental GTC which suggest the likelihood of consumer confusion. On November 11, 2011, "carmabrand.com" reported seeing one of Defendants' Bentley kit cars at a 2011 car show and stated, "[s]omeone would literally have to tell you it was a phony, even the interior seemed to be spot-on." (Carmabrand Art. Doc. # 1-10 at 4). On November 18, 2011, "auto123.com" also reported seeing one of Defendants' Bentley kit cars at a car show, stating that "[t]he Continental GTC is actually a Chrysler Sebring Convertible that underwent a makeover so thorough and realistic that it's nearly impossible to tell the difference. We sure were fooled when we spotted the car earlier this month . . . ." (Auto123 Art. Doc. # 94-2 at 6).

Thus, because Bentley has presented evidence of concurrent, unauthorized use of Bentley's protected marks as well as some evidence of actual confusion, Bentley has established the likelihood of confusion element of its statutory trademark infringement claim.

Having concluded that the Frary Defendants made use of Bentley's protected marks in commerce without Bentley's consent and that such use was likely to cause confusion, the Court grants Bentley's Motion for Summary Judgment as

to its claim for trademark infringement under 15 U.S.C. § 1114(1)(a).

       2.   **Trademark Counterfeiting**

With regard to Bentley's counterfeiting claim, "[t]he Lanham Act imposes liability for trademark counterfeiting on any person who shall 'use in commerce . . . any counterfeit . . . of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . .'" Nike Inc. v. Variety Wholesalers, Inc., 274 F. Supp. 2d 1352, 1367 (N.D. Ga. 2003) (quoting 15 U.S.C. § 1114(1)(a)). "A counterfeit mark is defined as 'a spurious mark which is identical with, or substantially indistinguishable from, a registered mark.'" Id. (quoting 15 U.S.C. § 1127).

The Court finds that the infringing kit cars in this case are indeed counterfeit Bentley products. The kit cars are identical to or substantially indistinguishable from Bentley products, and they bear marks identical to or substantially indistinguishable from protected Bentley marks.

"A showing of intent or bad faith is unnecessary to establish trademark counterfeiting in violation of § 1114." Nike Inc., 274 F. Supp. 2d at 1369 (citing Italian Activewear, 931 F.2d at 1472, 1476). Accordingly, since the infringing kit cars advertised and partially manufactured by the Frary Defendants were counterfeit, the Frary Defendants are liable to Bentley for Bentley's claim of trademark counterfeiting under § 1114.

### 3.   **Trademark Dilution**

[T]he owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

15 U.S.C. § 1125(c)(1).

"To prevail on a federal dilution claim, the plaintiff must demonstrate that: (1) the plaintiff's mark is famous; (2) the defendant used the plaintiff's mark after the plaintiff's mark became famous; (3) the defendant's use was commercial and in commerce; and (4) the defendant's use of the plaintiff's mark has likely caused dilution." Rain Bird Corp. v. Taylor, 665 F. Supp. 2d 1258, 1266-67 (N.D.

Fla. 2009) (noting that, after the 2006 amendments to 15 U.S.C. § 1125, a plaintiff need only prove a likelihood of dilution rather than actual dilution).

In accordance with 15 U.S.C. § 1125(c), "a mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner."  15 U.S.C. § 1125(c)(2)(A).  The non-exhaustive list of factors a court may consider in determining whether a mark is famous includes: (1) "The duration, extent, and geographic reach of advertising and publicity of the mark"; (2) "The amount, volume, and geographic extent of sales of goods or services offered under the mark"; (3) "The extent of actual recognition of the mark"; and (4) whether the mark is registered.  15 U.S.C. § 1125(c)(2)(A).  "To be famous, a mark must have a degree of distinctiveness and strength beyond that needed to serve as a trademark . . . it must be truly prominent and renowned."  Provide Commerce, Inc. v. Preferred Commerce, Inc., No. 07-80185CIV, 2008 WL 926777, at *5 (S.D. Fla. Apr. 4, 2008) (internal quotations omitted).

No party disputes that Bentley's marks are "famous" enough to warrant statutory protection from dilution.

Indeed, Bentley's certificate of registration for the trademark "BENTLEY" supports Bentley's contention that the mark has been used on both sides of the Atlantic by the British Auto Manufacturer since at least 1957. (Cert. Doc. # 1-6 at 2). Additionally, Bentley's certificate of registration for the trademark "B IN WINGS" reveals that Bentley has continuously used and applied the mark to automobiles "and the chassis thereof" since 1919. (Id. at 4).

Bentley is a household name, and its marks are accordingly deserving of statutory protection from dilution. See Michael Caruso & Co., Inc. v. Estefan Enterps., Inc., 994 F. Supp. 1454, 1463 (S.D. Fla. 1998) (finding that Congress intended to protect from dilution marks so inherently distinctive and famous as to rise to the level of "Buick" or "DuPont."); Provide Commerce, 2008 WL 926777, at *5 ("Examples of famous marks include Exxon, Kodak, Coca-Cola, Pepsi, Buick, Wal-Mart, DuPont and Budweiser."). The Court, finding Bentley's marks to be widely recognized by the general consuming public, thus determines the fame element of Bentley's trademark dilution claim to be satisfied.

The next element of Bentley's dilution claim, that the alleged infringer used the mark after the mark became famous, is also easily satisfied in this case. As previously explained, Bentley has employed continuous international use of its highly recognizable marks for nearly a century, and Bentley's patent for the original, ornamental design of the Bentley Continental GTC was issued in June of 2008. (Patent Doc. # 1-7 at 1-9). The Frary Defendants have not attempted to convince the Court that their use of the relevant marks predates the fame Bentley has generated with these marks.

Third, the Court finds that Defendants' use of Bentley's marks was "commercial and in commerce," Rain Bird, 665 F. Supp. 2d at 1267, as Frary's testimony reveals that he, on behalf of Keeping It Real, promoted, advertised, partially manufactured, and offered for sale the infringing kit cars. See (Frary Dep. Doc. # 94-4 at 9-11, 16-18). For instance, in response to the Facebook post: "I'll take one!!!  James A. where are you located. [sic]," Frary admitted to posting, on behalf of Keeping It Real, "Clearwater Florida let me know have 6 being built at this time so if you get in now you looking (sic) at 8 to 10 week turn around." (Id. at 17).

Finally, Bentley has demonstrated that the Frary Defendants have diluted its famous marks. Dilution may occur by tarnishment or by blurring. 15 U.S.C. § 1125(c)(1). "'Dilution by blurring' is association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark." 15 U.S.C. § 1125(c)(2)(B). "'Dilution by tarnishment is association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark." 15 U.S.C. § 1125(c)(2)(C).

A plaintiff's showing that a defendant used identical trademarks may constitute circumstantial evidence sufficient to support a finding of dilution. See Gen. Motors, 504 F. Supp. 2d at 1287 ("[A] plaintiff's showing that the defendant used identical trademarks constitutes circumstantial evidence sufficient to support a finding of actual dilution."); Nike, Inc., 274 F. Supp. 2d at 1372 ("[T]he Court concludes that [the defendant] has diluted the Nike trademarks due to the identical or virtually identical character of the marks on the Accused Goods to the Nike Trademarks."); Am. Honda Motor Co., Inc., v. Pro-Line Protoform, 325 F. Supp. 2d 1081, 1085 (C.D. Cal. 2004)

("[W]hen identical marks are used on similar goods, dilution -- the capacity of the famous mark to identify and distinguish the goods of the trademark holder -- obviously occurs.").

In this case, Bentley has demonstrated the Frary Defendants' use of marks identical or virtually identical to Bentley's protected marks.  <u>See, e.g.</u>, (B in Wings Doc. # 94-3 at 11; Replica Pic. Doc. # 94-5 at 8).  The Court accordingly finds summary judgment appropriate as to Bentley's trademark dilution claim.

### 4.   <u>False Designation of Origin</u>

"[A] false designation of origin claim . . . proscribes the behavior of 'passing off' or 'palming off,' which occurs when a producer misrepresents his own goods or services as someone else's."  <u>Custom Mfg. & Eng'r., Inc. v. Midway Servs., Inc.</u>, 508 F.3d 641, 647 (11th Cir. 2007) (internal quotation omitted).  "To establish a prima facie case under § 1125(a), a plaintiff must show (1) that the plaintiff had enforceable trademark rights in the mark or name, and (2) that the defendant made unauthorized use of it such that consumers were likely to confuse the two."  <u>Id.</u>

As previously explained, Bentley has undisputed and enforceable trademark rights in the marks at issue, and the Defendants were not authorized at any time to use Bentley's marks. The first element is thus satisfied. With respect to the likelihood of confusion element, courts evaluating likely confusion in a false designation of origin claim consider the same seven factors as those discussed above in the context of a trademark infringement claim. See id. at 648. As the Court has already determined that a likelihood of confusion exists, the second element is satisfied here. Accordingly, the Court grants Bentley's Motion for Summary Judgment with respect to the claim of false designation of origin.

### 5.  **Frary's Personal Liability**

The Court's summary judgment analysis applies equally to Frary and to Keeping It Real. In explaining the liability of an individual as well as the individual's affiliated corporation in a trademark infringement case, the Eleventh Circuit has stated: "The individual liability standard does not ask whether the individual participated or engaged in some infringing act; instead, [the standard] asks whether he actively participated as a moving force in the decision to engage in the infringing acts, or otherwise

caused the infringement as a whole to occur." Chanel, Inc. v. Italian Activewear of Fla., Inc., 931 F.2d 1472, 1478 n.8 (11th Cir. 1991). The Eleventh Circuit in Italian Activewear agreed with the district court's determination that no genuine issue existed as to the personal liability of an individual responsible for the infringing acts of his corporation. 931 F.2d at 1477-78. In that case, the court explained as follows:

> Natural persons, as well as corporations, may be liable for trademark infringement under the Lanham Act. See Mead Johnson & Co. v. Baby's Formula Serv., Inc., 402 F.2d 19 (5th Cir. 1968); 15 U.S.C. §§ 1114, 1127. Because of its very nature a corporation can act only through individuals. "Obviously[,] if there was an infringement by the corporation, this infringement was caused by some one or more persons either officers or employees of the corporation who caused the acts to be done." Mead Johnson, 402 F.2d at 23. If an individual actively and knowingly caused the infringement, he is personally liable. See id.; see also Wilden Pump & Eng'g Co. v. Pressed & Welded Prods. Co., 655 F.2d 984, 990 (9th Cir. 1981) (in analogous patent infringement context, [an] individual will be liable if he is [the] "moving, active, conscious force" behind infringement).
>
> Applying this standard to Brody, we agree no genuine issue exists on his personal liability. Brody was the president and chief executive officer of Italian Activewear. It was he who purchased the counterfeit goods . . .[;] he who advertised the goods as Chanel products in local publications; and he who operated the showroom from which the goods were sold.

Id.

As was the case in Italian Activewear, the Court finds that Frary's involvement in this matter "caused the infringement as a whole to occur."  931 F.2d at 1478 n.8. The evidence in this case demonstrates that Frary is the "president and CEO" of Keeping It Real (Doc. # 94-4 at 1), that Frary, on behalf of Keeping It Real, actively advertised the infringing kit cars (Doc. # 94-4 at 28, 29, 32; Doc. # 94-5 at 1-8), that the paint and body work for several of the infringing kit cars was performed by Frary at Keeping It Real (Doc. # 94-4 at 12, 28, 33), and that Frary accepted payment from customers for bodywork that he personally performed on the kit cars (Doc. # 94-4 at 9-11).

Frary thus actively caused the infringement in this case "as a moving, conscious force," Italian Activewear, 931 F.2d at 1478; the Court accordingly finds that no genuine issue exists as to Frary's personal liability.  As a result, the Court's summary judgment findings apply equally to Frary and to Keeping It Real.  See Selchow & Righter Co. v. Goldex Corp., 612 F. Supp. 19, 26 (S.D. Fla. 1985) ("The evidence submitted by the defendants shows that they are jointly involved in the importation and sale of [the infringing product].  As such, all three (3) defendants are responsible for any liability connected

37

therewith."); <u>Mead Johnson & Co. v. Baby's Formula Serv., Inc.</u>, 402 F.2d 19, 23 (5th Cir. 1968) ("[A trademark] is infringed when an individual performs the act or does the things that the . . . trademark law protects against. The fact that the persons thus acting are acting for a corporation also, of course, may make the corporation liable under the doctrine of respondeat superior. It does not relieve the individuals of their responsibility.").

## 6. <u>Intent</u>

While the intent of the Frary Defendants is irrelevant[3] for the purpose of granting Bentley's Motion for Summary Judgment as to the claims of (1) trademark infringement, (2) trademark counterfeiting, (3) trademark dilution, and (4) false designation of origin, the Court must resolve the issue of willfulness before determining the appropriate

---

[3] This principle applies to Frary as an individual as well as to Keeping It Real. The Court notes that, as illustrated by <u>Italian Activewear</u>, an individual's personal liability, predicated on a finding that he "actively and *knowingly* caused the infringement" to occur, may be properly established on summary judgment. 931 F.2d at 1477-78 (emphasis added). However, that same individual's *intent*, for purposes of awarding damages and attorney fees under § 1117(b), constitutes a question of fact for the factfinder. <u>Id.</u> at 1476. This Court accordingly finds that, although it has characterized Frary's actions as active and knowing for purposes of personal liability, this is not the equivalent of a finding of "willfulness" for purposes of determining whether an award under 15 U.S.C. § 1117(c)(2) would be appropriate.

award of statutory damages in this case. See Italian
Activewear, 931 F.2d at 1476 ("[A] showing of intent or bad
faith is unnecessary to establish a violation of §
1114(1)(a), or to seek remedies pursuant to § 1117(a).  But
where, . . . a registrant seeks the mandatory treble
damages and attorneys' fees provided for in § 1117(b), the
plaintiff must prove the defendants' intent to infringe.").

Although Bentley seeks statutory damages under section
1117(c) rather than 1117(b), section (c) similarly permits
a higher award of statutory damages if the Court determines
that a defendant's violation was committed with a
particular state of mind.   Specifically, 15 U.S.C. §
1117(c) provides as follows:

> (c) Statutory damages for use of counterfeit
> marks
>
> In a case involving the use of a counterfeit mark
> (as defined in section 1116(d) of this title) in
> connection with the sale, offering for sale, or
> distribution of goods or services, the plaintiff
> may elect, at any time before final judgment is
> rendered by the trial court, to recover, instead
> of actual damages and profits under subsection
> (a) of this section, an award of statutory
> damages for any such use in connection with the
> sale, offering for sale, or distribution of goods
> or services in the amount of--
>
> > (1) not less than $1,000 or more than
> > $200,000 per counterfeit mark per type of
> > goods or services sold, offered for sale, or
> > distributed, as the court considers just; or

> (2) if the court finds that the use of the
> counterfeit mark was *willful*, not more than
> $2,000,000 per counterfeit mark per type of
> goods or services sold, offered for sale, or
> distributed, as the court considers just.

15 U.S.C. § 1117(c) (emphasis added).

Bentley attempts to premise the Frary Defendants' willfulness on the theory that these Defendants intentionally used Bentley's marks in creating a counterfeit product; Bentley argues that "[t]he objective evidence demonstrates that the Frary Defendants received notice of Bentley's claims prior to Bentley filing its complaint in this case." (Doc. # 112 at 4). Specifically, Bentley argues:

> The Frary Defendants acknowledged Bentley's claims on their Facebook page when they responded to a question posted by an unrelated party, Kevin Joseph, who asked, "What ever happened to the fugazzi page???" On July 4, 2012, the Frary Defendants answered on behalf of the Fugazzi Defendants, stating, "you got it we are still here just layin low." . . . The Frary Defendants' actions before this lawsuit was filed, such as taking down their Fugazzi Cars Facebook page and stating that they were "just layin low," demonstrate that the Frary Defendants had not only received actual notice of Bentley's claims, but knew that what they were doing was "legally wrong."

(Doc. # 112 at 4).

However, regardless of Bentley's contention that the evidence in this case clearly demonstrates the Frary Defendants' awareness and intent regarding the claims at issue, the determination of a party's intent presents a question of fact not properly resolved on summary judgment. Nike, Inc., 274 F. Supp. 2d at 1355 (citing Italian Activewear, 931 F.2d at 1476). "As a general rule, a party's state of mind (such as knowledge or intent) is a question of fact for the factfinder, to be determined after trial." Italian Activewear, 931 F.2d at 1476. The undisputed facts in the present case might "support an inference of knowledge or willful blindness[,] [b]ut they do not so clearly compel that conclusion as to warrant finding intent as a matter of law." Id.

There is no doubt that Bentley seeks damages under subsection (2), which requires a finding of willfulness. In the Summary Judgment Motion, Bentley explains: "Bentley elects an award of statutory damages from Defendants in the amount of at least $1,000,000.00 . . . to wit, $500,000 for Defendants' 'turn-key' counterfeit Bentley Continental GTC automobiles and $500,000 for Defendants' 'Bentley Car Kit' products, or alternatively $500,000 per infringing mark for the two registered Bentley marks at issue." (Doc. # 94 at

25).   Bentley  has  neglected  to  clarify  against  which Defendants Bentley seeks such an award.   To the extent Bentley  seeks  damages  against  the  Frary  Defendants  under subsection  (2),  this  award  may  not  be  imposed  until  such time  as  the  finder  of  fact  has  determined  the  issue  of willfulness with regard to the Frary Defendants' conduct.

The Court acknowledges Bentley's argument that "[t]his Court  has  already  found  that  Defendants'  actions  were intentional," referencing the Order of the Magistrate Judge recommending  that  Bentley's  motion  for  preliminary injunction  be  granted.   (Doc. # 43 at 14 n.10).   Bentley is incorrect;  in  this  action,  the  Court  has  not  yet scrutinized  the  issues  of  Defendants'  intent  according  to the standard applicable to a motion for summary judgment.

The  Order  on  which  Bentley  relies  instead  applied  the four-part  analysis  for  evaluating  a  motion  for  preliminary injunction.   Furthermore,  the  specific  statement  within  the Order  upon  which  Bentley  relies  addresses  intent  with regard  to  Defendant  McEntegart  and  does  not  mention  the Frary  Defendants.   (Id.).   Accordingly,  despite  Bentley's characterization  to  the  contrary,  this  Court  has  made  no conclusive  finding  as  to  the  Frary  Defendants'  intent  or willfulness in this matter.

42

Accordingly, a factual issue remains concerning the willfulness of the Frary Defendants' participation in the sale, offering for sale, or distribution of the counterfeit marks in this case.

C.  **Permanent Injunction**

As explained above, the Court determines that Bentley is entitled to summary judgment against the Frary Defendants with respect to Bentley's claims for (1) trademark infringement, (2) trademark counterfeiting, (3) trademark dilution, and (4) false designation of origin. The Court declines to grant summary judgment on the issue of willfulness for purposes of determining the appropriate award of statutory damages against the Frary Defendants at this juncture.

However, Bentley seeks not only statutory damages against the Frary Defendants, but additionally seeks the "entry of a permanent injunction against the Frary Defendants in substantially the same form as the Permanent Injunction Order entered by the Court against the Fugazzi Defendants (Doc. # 75) on December 28, 2012." (Doc. # 94 at 7).

"Under traditional equitable principles, a plaintiff seeking a permanent injunction must demonstrate (1) it has

suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction." Angel Flight of Ga., Inc. v. Angel Flight Am., Inc., 522 F.3d 1200, 1208 (11th Cir. 2008).

"[I]n ordinary trademark infringement actions[,] complete injunctions against the infringing party are the order of the day. The reason is simple: the public deserves not to be led astray by the use of inevitably confusing marks . . . ." Id. at 1209. Furthermore, the Eleventh Circuit has noted that "[i]t is generally recognized in trademark infringement cases that (1) there is no[ ] adequate remedy at law to redress infringement and (2) infringement by its nature causes irreparable harm." Tally-Ho, Inc. v. Coast Cmty. Coll. Dist., 889 F.2d 1018, 1029 (11th Cir. 1989) (quoting Processed Plastic Co. v. Warner Commc'ns, 675 F.2d 852, 858 (7th Cir. 1982)).

The Court accordingly finds that, in light of the determination that the Frary Defendants indeed infringed Bentley's protected marks, a permanent injunction is

warranted.   The Court thus enters the following permanent injunction against Defendants Robert Frary and Keeping It Real Auto Customizing, Inc.:

Defendants Robert Frary and Keeping It Real Auto Customizing, Inc., as well as their principals, employees, agents, and assigns, and all others acting through them, are hereby:

(1)   enjoined from manufacturing, advertising, marketing and/or selling car body kits and/or replica cars that use, copy, or misappropriate the following trademarks: BENTLEY®, the Bentley B™, and/or the B IN WINGS®;

(2)   enjoined from otherwise violating Bentley's trademark rights;

(3)   ordered to post a complete and unedited copy of this injunction on any website (including, but not limited to, Facebook and other social media sites) where Defendants have previously published, posted, marketed, advertised, and/or commented with respect to replica Bentley vehicles and/or Bentley kits.

## IV.   **Default Judgment Against Defendants Matthew McEntegart and Fugazzi Cars, Inc.**

### A.   **Legal Standard**

Federal Rule of Civil Procedure 55(a) provides: "When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default."   A district court may enter a default judgment against a properly served defendant who fails to defend or otherwise appear pursuant to Federal Rule of Civil Procedure 55(b)(2). DirecTV, Inc. v. Griffin, 290 F. Supp. 2d 1340, 1343 (M.D. Fla. 2003).

The mere entry of a default by the Clerk does not, in itself, warrant the Court entering a default judgment. See Tyco Fire & Sec. LLC v. Alcocer, 218 F. App'x 860, 863 (11th Cir. 2007) (citing Nishimatsu Constr. Co. v. Hous. Nat'l Bank, 515 F.2d 1200, 1206 (5th Cir. 1975)).   Rather, a Court must ensure that there is a sufficient basis in the pleadings for the judgment to be entered.   Id.   A default judgment has the effect of establishing as fact the plaintiff's well-pled allegations of fact and bars the defendant from contesting those facts on appeal.   Id.

"Once liability is established, the court turns to the issue of relief." Enpat, Inc. v. Budnic, 773 F. Supp. 2d 1311, 1313 (M.D. Fla. 2011).   "Pursuant to Federal Rule of Civil Procedure 54(c), '[a] default judgment must not

differ in kind from, or exceed in amount, what is demanded in the pleadings,' and a court may conduct hearings when it needs to determine the amount of damages, establish the truth of any allegation by evidence, or investigate any other matter." Id.

**B.  Discussion**

Within Bentley's Complaint, Bentley consistently stated all claims for relief against "Defendants" generally, and thus did not distinguish between the Frary Defendants and the Fugazzi Defendants when alleging facts to support its claims for trademark dilution (Count I), trademark infringement and counterfeiting (Count II), false advertising, false designation of origin, and trade dress infringement (Count III), and design patent infringement (Count IV). (Doc. # 1 at 16-20).

As implied by the Court's finding that Bentley is entitled to summary judgment on its claims against the Frary Defendants, the Court finds that Bentley has provided a sufficient basis in the pleadings for judgment to be entered in Bentley's favor as to the claims of (1) trademark infringement, (2) trademark counterfeiting, (3) trademark dilution, and (4) false designation of origin against the Fugazzi Defendants as well. Having determined

that Bentley supplied well-pled allegations of fact to support these claims, the Court will not repeat the elements of these four causes of action in analyzing Bentley's entitlement to default judgment against the Fugazzi Defendants.  The Court finds that the Fugazzi Defendants, by their default, have admitted each of Bentley's well-pled allegations, and are thus liable to Bentley for its claims of (1) trademark infringement, (2) trademark counterfeiting, (3) trademark dilution, and (4) false designation of origin.  The Court will now proceed to evaluate those claims asserted within the Complaint, but not raised against the Frary Defendants in the summary judgment context.

### 1.   <u>False Advertising</u>

"To succeed on a false advertising claim under § 43(a)(1)(B) of the Lanham Act, a plaintiff must establish that (1) the advertisements of the opposing party were false or misleading; (2) the advertisements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on purchasing decisions; (4) the misrepresented product or service affects interstate commerce; and (5) the movant has -- or is likely to be -- injured as a result of the false advertising."  <u>Hickson</u>

Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th
Cir. 2004).

Within Bentley's Complaint, Bentley alleged that
Defendants' misappropriation of Bentley's marks and trade
dress was likely to confuse, mislead or deceive customers
and potential purchasers, that Bentley's misleading
advertisements were posted online in connection with the
sale or offering for sale of the counterfeit vehicles at
issue, that Bentley's infringing acts had caused actual
confusion in the marketplace, and that Bentley had suffered
irreparable harm as a result. (Doc. # 1 at 3, 14, 15, 19).
By default, the Fugazzi Defendants have admitted to these
well-pled allegations. Consequently, each of these factors
has been satisfied, and Bentley is entitled to default
judgment against the Fugazzi Defendants on its claim for
false advertising.

### 2.   **Trade Dress Infringement**

"In order to prevail on [a] claim for trade dress
infringement under § 43(a) [of the Lanham Act], [a
plaintiff] must prove that (1) the product design of the
two products is confusingly similar; (2) the features of
the product design are primarily non-functional; and (3)
the product design is inherently distinctive or has

acquired secondary meaning."  Dippin' Dots, Inc. v. Frosty

Bites Distrib., LLC, 369 F.3d 1197, 1202 (11th Cir. 2004).

Within the Complaint, Bentley has alleged that the knockoff

Bentley vehicles have been confused with Bentley's original

product design, that Bentley's trade dress includes the

non-functional appearance and shape of the Bentley GTC, and

that Bentley's product design is inherently distinctive and

has acquired secondary meaning.  (Doc. # 1 at 2, 12, 14).

Thus, Bentley has alleged sufficient facts within the

Complaint to state a claim for trade dress infringement,

and the Fugazzi Defendants, by default, have admitted those

factual allegations.  Bentley is accordingly entitled to

default judgment against the Fugazzi Defendants as to

Bentley's claim for trade dress infringement.

### 3.  Design Patent Infringement

Section 271 of Title 35, United States Code, provides:

"whoever without authority makes, uses, offers to sell, or

sells any patented invention, within the United States or

imports into the United States any patented invention

during the term of the patent therefor, infringes the

patent."  35 U.S.C. § 271(a).

The Complaint alleges that Bentley has obtained a U.S.

Design Patent "for the ornamental design of Bentley

vehicles," U.S. Patent No. D570,738S  (Doc. # 1 at ¶ 24),
and that "Plaintiff Bentley Motors, Inc. is charged by
plaintiff Bentley Motors Limited with the protection of the
Bentley Marks and the '738 Patent in the United States"
(Id. at ¶ 25).  The Complaint further alleges that the
Fugazzi Defendants have infringed the '738 Patent by their
"manufacture, use, importation, sale, and/or offer for sale
of knockoff Bentley vehicles . . . ," that the infringement
was willful, and that the infringement has "damaged,
injured, and continues to injure Bentley."  (Id. at ¶¶ 61,
63-64).

These factual allegations, taken as true, are
sufficient to establish that the Fugazzi Defendants are
liable for direct infringement of the '738 Patent under 35
U.S.C. § 271.  Bentley's factual allegations are further
supported by photographs and other evidence attached to the
Complaint and to the instant Motion.  In light of the
allegations admitted due to the Fugazzi Defendants' default
as well as the uncontroverted evidence in the record, the
Court finds that the Fugazzi Defendants infringed Bentley's
'738 Patent in violation of 35 U.S.C. § 271.  See Enpat,
Inc. v. Budnic, 773 F. Supp. 2d 1311, 1314 (M.D. Fla.
2011).

**V.**   __Damages__

Bentley seeks statutory damages pursuant to 15 U.S.C. § 1117(c) rather than actual damages.  "The statutory damage provision, § 1117(c), was added in 1995 because counterfeit records are frequently nonexistent, inadequate, or deceptively kept[,] making proving actual damages in these cases extremely difficult if not impossible." __PetMed__ __Express, Inc. v. MedPets.Com, Inc.__, 336 F. Supp. 2d 1213, 1219-20 (S.D. Fla. 2004) (internal quotation omitted). Although Bentley has elected to seek statutory rather than actual damages in this matter, the Court nonetheless finds a hearing necessary to determine the appropriate award of damages.[4]  Accordingly, the Court defers its determination of the appropriate amount of damages in this case until

---

[4] The hearing will address damages with regard to the Fugazzi Defendants as well as the Frary Defendants despite the entry of default judgment. Although well-pleaded facts in a complaint are deemed admitted, a plaintiff's allegations relating to the amount of damages are not admitted by virtue of default; rather, the Court must determine both the amount and character of damages. __Miller__ __v. Paradise of Port Richey, Inc.__, 75 F. Supp. 2d 1342, 1346 (M.D. Fla. 1999); __see__ __also__ __Anheuser Busch, Inc. v. Philpot__, 317 F.3d 1264, 1266 (11th Cir. 2003) (acknowledging that federal law requires judicial determination of damages absent a factual basis in the record).

such time as the finder of fact has resolved the issue of willfulness with regard to the Frary Defendants.[5]

Importantly, the Court notes that Bentley's ability to enforce any monetary judgment entered against Defendant Matthew McEntegart in this action is subject to the terms imposed by the United States Bankruptcy Court, Middle District of Florida, in which McEntegart's bankruptcy case, No. 8:12-bk-12774-MGW, has been pending during the course of this litigation. See (Doc. # 56 at 2; Doc. # 57-2).[6]

## VI. Conclusion

The Court grants Bentley's Motion for Summary Judgment against the Frary Defendants as to Bentley's claims for (1) trademark infringement, (2) trademark counterfeiting, (3) trademark dilution, and (4) false designation of origin. The Court additionally grants Bentley's requested permanent injunction against the Frary Defendants as detailed herein. Furthermore, the Court grants Bentley's Motion for Default Judgment against the Fugazzi Defendants.

---

[5] The Court notes that, by virtue of their default, the Fugazzi Defendants are deemed to have admitted to the willfulness of their conduct as alleged by Bentley in the Complaint. (Doc. # 1 at 14).

[6] On September 4, 2012, the bankruptcy court granted Bentley's motion for relief from the automatic bankruptcy stay under 11 U.S.C. § 362 for the purpose of proceeding in this action against Defendant McEntegart. (Doc. # 57-2).

However, the Court finds that a genuine issue of fact remains regarding the willfulness of the Frary Defendants' conduct.  In light of this remaining question of fact, the Court declines to determine the appropriate amount of damages at this juncture.  This case will proceed to a bench trial as scheduled, during the December, 2013 trial term, for the purpose of resolving the remaining factual issue of willfulness as to the Frary Defendants.  After this factual issue has been resolved, the Court will proceed to determine the appropriate award of damages.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1) Plaintiffs' Motion for Default Judgment against Defendants Matthew McEntegart and Fugazzi Cars, Inc. is **GRANTED.**

(2) Plaintiffs' Motion for Summary Judgment is **GRANTED** as detailed herein.

(3) The Court defers entry of final judgment until such time as the Court has made a determination on the issue of damages.

(4) Defendants Robert Frary and Keeping It Real Auto Customizing, Inc., as well as their principals,

employees, agents, and assigns, and all others acting through them, are hereby:

(a) enjoined from manufacturing, advertising, marketing and/or selling car body kits and/or replica cars that use, copy, or misappropriate the following trademarks: BENTLEY®, the Bentley B™, and/or the B IN WINGS;

(b) enjoined from otherwise violating Bentley's trademark rights;

(c) ordered to post a complete and unedited copy of this injunction on any website (including but not limited to Facebook and other social media sites) where Defendants have previously published, posted, marketed, advertised, and/or commented with respect to replica Bentley vehicles and/or Bentley kits.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 30th day of September, 2013.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies: All Counsel of Record